FELIX CINEMATOGRAFICA S.r.l. and Franco Rossellini, Plaintiffs,

v.

PENTHOUSE INTERNATIONAL, LTD., Penthouse Films International, Ltd., Penthouse Clubs International Establishment, Penthouse Records Ltd., and Robert Guccione, Defendants.

No. 81 Civ. 3435.

United States District Court, S.D. New York.

Sept. 19, 1983.

Jay Julien, New York City, for plaintiffs; Philip J. Kassel, New York City, of counsel.

Shea & Gould, New York City, for defendants; Martin I. Shelton, Richard M. Goldstein and Susan B. Ratner, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This litigation centers about the production, distribution, and exploitation of a motion picture, "Caligula," which was filmed in Italy, and the allocation of profits derived from the film. Currently before the Court is a motion by the defendants to dismiss plaintiffs' amended complaint for failure to join an indispensable party, who if served would defeat diversity jurisdiction.

The plaintiffs are Felix Cinematografica S.r.l. ("Felix"), a corporation organized under the laws of Italy, and Franco Rossellini ("Rossellini"), a citizen of Italy and domiciliary of Monaco. The defendants named in the amended complaint are Penthouse Films International, Ltd. ("Films"), Penthouse International, Ltd., and Penthouse Records Ltd. Each is a New York corporation. Also named as a defendant is Robert Guccione ("Guccione"), a citizen of the United States, domiciled in, and a resident of, the State of New York. Omitted from the amended complaint is Penthouse Clubs International Establishment ("Clubs"), which was named as a defendant in the original complaint. The instant motion centers about the non-inclusion of Clubs as a defendant in the action.

Under the original complaint the relief sought from all named defendants was: (1) an accounting of the proceeds of Caligula; (2) enforcement of plaintiffs' rights with respect to the picture; and (3) an order enjoining the defendants from any conduct that violates plaintiffs' interests in the film, including, among other matters, the music and novelization rights.

The defendants, who then included Clubs, moved to dismiss the original complaint on the ground that since both plaintiffs are aliens and Clubs is a Lichtenstein corporation their presence on opposite sides of the action destroyed complete diversity jurisdiction. Plaintiffs, in affidavits and briefs, opposed the motion essentially upon the ground that Clubs' principal place of busi-

ness was in New York[1] and thus it was also a citizen of New York, with dual citizenship and hence statutory diversity requirements were not defeated.[2] Plaintiffs also argued in opposition to the motion that Clubs was not an independent corporation but actually acted as an arm and agent of Penthouse International, Ltd., of which it was a wholly-owned subsidiary; and, in any event, Clubs was not a necessary party and the action could be maintained solely against the other defendants. However, the issues raised under that motion were not decided since the plaintiffs, despite their contentions, during oral argument moved for leave to file an amended complaint. That motion was granted.

The amended complaint, except for its omission of Clubs as a defendant, in all other respects is substantially identical to the original complaint: it asserts against all defendants the same claims for breach of contract, an accounting, and varied injunctive relief and monetary damages. It includes a claim not previously alleged, for infringement by defendants of the music of "Caligula." As noted above, the defendants now move to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(7) for failure to join Clubs as a necessary and indispensable party under Rule 19.

Rule 19 was amended in 1966 in part to eliminate encrusted, technical, and semantic definitions of "indispensable parties."[3] Indeed, our Court of Appeals has suggested that since a purpose of the amendment was to eliminate rigidity of judgment in deciding who is an indispensable party, the term

itself is misleading and that the Rule requires a balancing of the interests "of the parties and of the outsider, those of the public and of the Court in seeing that the litigation is both effective and expeditious."[4]

■ In *Provident Tradesmens Bank & Trust Company v. Patterson*[5] the Supreme Court made it clear that under the amended rule indispensability is to be determined on a pragmatic, case-by-case analysis based upon considerations of "equity and good conscience", the term used in subdivision (b) of the Rule. Mr. Justice Harlan particularized four "interests" to be evaluated in deciding a claim of indispensability. First, the interest of the plaintiff in having a forum, with the strength of this interest dependent upon "whether a satisfactory alternative forum exists."[6] Second, the defendants' interest in avoiding multiple litigation and inconsistent relief. Third, the interests of the non-party whom it would have been desirable to join even though in his absence a judgment is not *res judicata* as to, or legally enforceable against, him. Finally, the interests of the courts and the public in complete, consistent and efficient settlement of controversies.[7] Mr. Justice Harlan further observed that:

> . . . The decision whether to dismiss (*i.e.,* the decision whether the person missing is "indispensable") must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by

---

1. 28 U.S.C. § 1332(c) (1976) provides that "a corporation shall be deemed a citizen of any state . . . where it has its principal place of business." *See also Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y. 1959).

2. However, plaintiffs' position is incorrect. *See Corporacion Venezolana v. Vintero Sales Corp.,* 629 F.2d 786, 790 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *see also Clarkson Co. Ltd. v. Shaheen,* 544 F.2d 624, n. 5 (2d Cir.1976); *but see Bergen Shipping Co. Ltd. v. Japan Marine Servs. Ltd.,* 386 F.Supp. 430 (S.D.N.Y.1974).

3. *Prescott v. Plant Indus., Inc.,* 88 F.R.D. 257, 260 (S.D.N.Y.1980).

4. *Kamhi v. Cohen,* 512 F.2d 1051, 1053–54 (2d Cir.1975).

5. 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

6. *Id.* 390 U.S. at 109, 88 S.Ct. at 738.

7. *Id.* at 109–11, 88 S.Ct. at 737–39; *see also Prescription Plan Serv. Corp. v. Franco,* 552 F.2d 493, 497 (2d Cir.1977).

themselves, and some subject to balancing against opposing interests.[8]

Against that background of applicable law we turn to the facts.

On October 6, 1975, a "Joint Venture Agreement" was entered into for the production, distribution, and financing of "Caligula." The signatories to the agreement are Felix and Clubs. It provides that if a contractee fails to contribute its required share of capital to the film's production, its share of the film's net profit, if any, is limited to ten percent. The defendants claim that this is the operating agreement governing the parties' relationship and that consequently Clubs is an indispensable party. There is, however, another agreement and other matters to be considered.

On June 15, 1976, Felix and Films executed a document referred to therein as the "Joint Production Contract," and thereafter several amendments thereto. That agreement was signed under the following circumstances. The then president of Films forwarded to Rossellini a copy of the "Joint Production Contract," describing it as that "which you need to present to the Italian Ministero to apply for the Italian aid"; the letter continued, "obviously, it contains certain clauses and statements which are quite contrapuntal to our initial agreement between Felix and Penthouse." Rossellini was requested to "acknowledge by signing the bottom of this letter that this Joint Production Contract does not constitute the essence of the Joint Venture Agreement between ... Penthouse Films and Felix ... signed ... on October 6, 1975 and that it's only the Joint Venture Agreement dated October 6, 1975 that will be binding between Felix and Penthouse and not this new Joint Production Contract." Rossellini signed under the words "[a]greed and accepted." Thus defendants contend that the sole agreement in existence is the Joint Venture Agreement dated October 6th, 1975.[9] The plaintiffs, on the other hand, stressing that the letter that forwarded the

Joint Production Contract was signed by the president of Films and not by an officer of Clubs, the signatory to the Joint Venture Agreement, contend that its contract is with Films and not with Clubs—that the Joint Venture Agreement with Clubs was superseded by the Joint Production Contract with Films—in effect, there was a novation. Accordingly, they argue, contrary to the defendants' position, that Clubs is not an indispensable party.

Apart from their differences as to which contract is in effect, the parties also differ as to why the June 1976 Joint Production Contract was signed. The defendants contend that the letter that accompanied it, with its opening statement to Rossellini describing the proposal as that "which you need to present to the Italian Ministero to apply for Italian aid," is by itself explanatory; the document was executed upon Rossellini's representation that it was required to demonstrate a sufficient interest in the film by Italian parties in order to obtain subsidies from the Italian government. Also, to support their position that the Joint Venture Contract is the sole governing agreement the defendants rely upon other documentary proof. One is a letter signed by Rossellini on May 21, 1978 and sent to the defendant Robert Guccione that stated that "notwithstanding the documents and invoices given to me by [a chartered accountant] from time to time for the purposes of submitting rates to the Italian government regarding ... Caligula ... the original agreement between us regarding ... Caligula remains unchanged." Plaintiffs contend that the foregoing documents confirm the "exact opposite" of that urged by the defendants—a position not readily apparent from the express language contained therein. In any event, Rossellini denies that the Joint Production Contract was signed at his urging to present to the Italian government and asserts that it instead reflects the parties' understanding to replace the Clubs agreement. Each group contends that one or more documents bearing its signature was understood to be with-

---

**8.** 390 U.S. at 118–19, 88 S.Ct. at 743.

**9.** The defendants, stressing the date October 6th, 1975, contend the reference to "Films" is a mistake.

out effect.[10] Whatever the fact as to the reason why the Joint Production Contract of June 1976 was executed,[11] the issue need not be resolved on this motion, but the conflict has bearing on whether Clubs is an indispensable party. Essentially, what is at issue is whether the Joint Venture Agreement of October 1975 or the Joint Production Contract of June 1976 governs the production and exploitation of the film and the rights of the participants to the distribution of its earnings. Under the former, the defendants contend plaintiffs are limited to ten percent of the net profits, whereas under the latter, plaintiffs claim to be entitled to thirty-five percent.

The original complaint sought judgment against all defendants, including Clubs, without asserting any separate and distinct claim against any defendant. It alleged the Joint Venture Agreement dated October 1975, as well as the June 1976 Joint Production Contract and the amendments thereto as the bases upon which plaintiffs claimed they were entitled to judgment. The allegation with respect to the Joint Venture Agreement was incorporated by reference into all causes of action. Each and every cause of action was asserted without differentiation as against all defendants, including Clubs; all defendants including Clubs were referred to "collectively as 'Penthouse'"; all acts that allegedly deprived plaintiffs of their rights were attributed to all defendants without distinction; and the injunctive and monetary relief sought was the same as against all defendants. Thus, plaintiffs' position on this motion, that the claims against the instant defendants made in the original complaint were "completely independent of the claim against Clubs," is contrary to the record.

The plaintiffs' further contention, that their current claims against Clubs are independent of those advanced against the instant defendants in the amended complaint, disregards the facts. Thus they now assert that a claim against Clubs is that it (Clubs) obtained monies through the unauthorized exploitation of Caligula and that this claim is not related to any contract. However phrased or cast the claim may be, what cannot be downed is that it arises out of the production, exploitation, and financing of Caligula and Clubs' asserted rights to the picture, which plaintiffs dispute. Clubs, as do the other defendants, contends that it had the right to exploit the film under the Joint Venture Agreement. The simple fact is that whatever the nature of plaintiffs' claims against Clubs, whether in fraud, conversion, contract, or otherwise, they cannot be advanced without resolving the issue of whether the Joint Venture Agreement or the Joint Production Agreement controls. While plaintiffs have not been entirely consistent in their various arguments, they have acknowledged "there can be no dispute but that only one of these two agreements can be operative."[12] The sharp conflict as to which of two documents constitutes the parties' basic agreement can be determined only upon a consideration of the nucleus of all facts and circumstances attendant upon their execution. In short, those two agreements are so interrelated that the issue as to whether, as plaintiffs contend and defendants deny, the June 1976 contract superseded the Joint Venture Agreement should be resolved in an action where Clubs is a party. Clubs' interests are clearly implicated—exactly as plaintiffs recognized when they served their original complaint in which both documents were

---

**10.** While none of the litigants comment thereon, there is an implicit suggestion that the June 1976 document was to be used to overreach the Italian government with respect to governmental subsidies, which if true, may raise other issues.

**11.** In addition to the dispute as to the reason for the execution of the Joint Production Contract, an issue exists with respect to an alleged agreement whereby Felix purported to assign all its rights of whatever nature in the film to Films. As to a document that bears his signature on behalf of Felix, Rossellini contends he signed it at the request of an accountant for defendants for their use in England but was told "that it would not constitute an agreement binding upon us." Rossellini affidavit in opposition to original motion.

**12.** Plaintiffs' Brief in Opposition 14.

alleged as a basis for recovery, Clubs was named as a defendant, and identical claims for relief were advanced against all defendants without restriction. In sum, the Court holds that Clubs is an indispensable party and that dismissal of the action is warranted upon a consideration of pertinent factors.

Plaintiffs have an available forum to litigate their claims against Clubs and the other defendants. Clubs, in response to the Court's inquiry upon the argument of this motion, has consented, in the event the motion to dismiss is granted, to personal jurisdiction in the Supreme Court of the State of New York solely in connection with the claims alleged by plaintiffs in their original and amended complaint. New York State clearly is a satisfactory and proper forum in which to resolve this litigation, particularly since the other defendants are New York corporations and the individual defendant is a resident and citizen of that State; and further, as already noted, on the prior motion to dismiss the plaintiffs urged in opposition thereto that Clubs, a wholly owned subsidiary of Penthouse International, had a principal place of business in New York. Moreover, both agreements provide that they shall be construed under the laws of the State of New York.[13]

When Clubs indicated its consent to jurisdiction in a New York state action, plaintiffs for the first time offered to forego all claims against Clubs and to confine their claims solely to the defendants named in the amended complaint. Obviously, plaintiffs' recent offer is designed to avoid the elimination of diversity jurisdiction. Plaintiffs, of course, were free before and remained free during the litigation to forego or waive any claim but such action may not be taken to frustrate the public policy in the enforcement of the diversity statute.[14] Plaintiffs' latest move, pending a decision by this Court on defendants' motion, if permitted, would contravene strong congressional policy that diversity jurisdiction is available only when the statutory requirements are clearly met. The Supreme Court has observed that "it is a fundamental precept that federal courts are courts of limited jurisdiction. The limits upon federal jurisdiction, whether imposed by the Constitution or by the Congress must be neither disregarded nor evaded."[15] To allow plaintiffs' latest move to control the issue on this motion during its consideration by the Court would permit them to determine the issue and to overcome the congressional mandate governing diversity jurisdiction. To paraphrase the Supreme Court, "to allow the requirement of complete diversity jurisdiction to be circumvented as [now attempted] in this case would simply flout the congressional command."[16]

Entirely apart from New York State Courts, there is another forum available to plaintiffs with respect to whatever claims they may have against Clubs. Several days before plaintiffs filed this lawsuit Clubs instituted an action in Italy before the Tribunal of Rome for an accounting by plaintiffs of funds allegedly disbursed by them in the production of Caligula based upon the Joint Venture Agreement. Plaintiffs are free to interpose in that proceeding whatever defenses or counterclaims they may have against Clubs. For reasons that are not altogether clear on this record they prefer to continue with this litigation be-

---

13. Defendants also have consented to waive all statutes of limitations defenses in such a state court action, except for those that would be available were diversity jurisdiction retained.

14. *Cf. Potomac Elec. Power Co. v. Babcock & Wilcox Co.,* 54 F.R.D. 486, 492 (D.Md.1972): If indispensability is a benefit which can be waived by a party for the purpose of securing diversity jurisdiction, federal courts would lose control over their jurisdictional boundaries. Equity and good conscience would seem to require that under circumstances such as those present here, parties should present their claims in a state court rather than attempt to manipulate jurisdiction by dropping plaintiffs with a substantial interest in the claim solely for the purpose of retaining jurisdiction in the federal court.

15. *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978).

16. *Id.* at 377, 98 S.Ct. at 2404.

fore this Court, eschewing both the Italian and New York State courts. Thus plaintiffs urge that the case should proceed in this Court without Clubs and argue that should they fail to sustain their claim that the Joint Production Contract is the controlling document, then Clubs may commence a separate action in another available forum or proceed with its pending suit in Italy. This suggests a sheer waste, not only of the litigants' time and effort and the imposition of additional and unnecessary heavy legal fees and expenses upon defendants and Clubs, but, surely equally as important, a squandering of judicial time and effort. It simply defies common sense to countenance such a situation. It would be unfair to the defendants and contrary to public policy and the public interest.

While the foregoing factors by themselves, as a matter of fairness, equity, and good conscience, support dismissal of the action in the absence of Clubs, another factor gives additional support thereto. To allow the action to proceed without Clubs presents a risk to it. While the plaintiffs acknowledge that a judgment would not bind Clubs, that does not end inquiry. As Mr. Justice Harlan noted in discussing the various interests to be considered under Rule 19, while a judgment may not be *res judicata* or binding upon a non-party, it "obviously does not mean either (a) that a court may never issue a judgment that in practice affects a non-party, or (b) that (to the contrary) the court may always proceed without considering the potential effect on non-parties simply because they are not 'bound' in the technical sense.... [T]he court must consider the extent to which the judgment may 'as a practical matter impair or impede his ability to protect' his interest in the subject matter." [17] .

Clubs, in its pending lawsuit in Italy, claims it is the owner of the film and is entitled to an accounting from plaintiffs.

As a practical matter Clubs' prosecution of its claims in Italy may be impeded by a judgment entered in this action. If plaintiffs prevail here upon their contention that the controlling document is the June 1976 agreement, there is the prospect that they may argue such a judgment has a preclusive effect with respect to Clubs' contrary position that the only valid agreement is the Joint Venture Agreement. We do not suggest that there is merit to such a contention, but it cannot be ignored that such a claim may be advanced upon allegations that Clubs was in privity with the other defendants so as to give rise to a plea of *"res judicata"* or collateral estoppel.[18] This is more than pure theory or conjecture. It has already been noted that plaintiffs in their initial effort to keep Clubs in this action stressed that "it was not an independent corporation but actually acted as an arm or agent of Penthouse International Limited, of which it was a wholly owned subsidiary" and that "the activities of the corporate defendants are so intermingled that they cannot be deemed separate but actually are one firm." [19] While the issue is not before this Court, the risk exists that an argument may be urged of the preclusive impact of a judgment in favor of the plaintiffs in this case. Whatever the merits of Clubs' claims in an Italian lawsuit, such a contention would complicate and compound what should be a simple issue—who owns the rights to the film—the very issue at the heart of the controversy here. Moreover, the absence of Clubs poses the prospect of inconsistent determinations concerning the rights to the film. Should Films prevail in this action and establish that the only effective agreement is the Joint Venture Agreement of October, 1975, then the plaintiffs, in the absence of Clubs, would be free to institute an action against Clubs, thereby involving the parties in further duplicative litigation.

---

**17.** *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968).

**18.** See *Gill & Duffus Servs., Inc. v. A.M. Nural Islam*, 675 F.2d 404, 405–06 (D.C.Cir.1982);

*Meyer v. MacMillan Publishing Co., Inc.*, 526 F.Supp. 213, 216–18 (S.D.N.Y.1981).

**19.** Plaintiffs' Supplemental Brief on original motion 4, 26, *passim*.

Finally, plaintiffs urge that the action should not be dismissed because this Court has exclusive subject matter jurisdiction with respect to the cause of action for copyright infringement, which was not alleged in the original complaint but included in the amended complaint. In that cause of action plaintiffs allege that the music of Caligula is owned by Felix and that the defendants have wrongfully recorded the license or sound rights to the music in violation of plaintiffs' rights. The fact that plaintiffs assert ownership of the copyright to the music and infringement does not automatically mean that jurisdiction exists under 28 U.S.C. § 1338, which grants the district courts exclusive jurisdiction of any civil action arising under any act of Congress relating to copyrights.[20] The formal allegations of the complaint must yield to the substance of the claim. It is significant that plaintiffs as to this claim have not alleged jurisdiction under § 1338. But more important, it is evident that the claim derives from a contractual relationship and its alleged breach. Rossellini has submitted an affidavit that states the claim is based upon an agreement by Felix (signed by Rossellini) dated November 8th, 1980, whereby Felix assigned to International its rights in certain music including the musical score of the film. This assignment Felix claims was rescinded because of failure to make the payment provided thereunder. That the issue is a breach of an alleged contract is further made manifestly clear by plaintiffs' counsel who, with respect to this item, states that "an agreement had been entered into between only Felix and International . . . for the assignment of the music to International, and, in view of the breach of that agreement by failing to make any payment called for thereunder, any assignment was rescinded."[21] Thus the claim revolves about whether payment for the assignment was made and consequently, who owns the copyright.[22] The claim is so clearly based upon a breach of contract that further discussion is not warranted.

In sum, upon a consideration of all factors affecting the interests of the litigants, the non-litigant, and the public and the courts, this Court is persuaded that in fairness, equity, and good conscience this case cannot proceed without Clubs as a defendant. Accordingly, the motion to dismiss is granted.

So ordered.

---

**20.** *T.B. Harms Co. v. Eliscu,* 226 F.Supp. 337 (S.D.N.Y.), *aff'd,* 339 F.2d 823 (2d Cir.1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); *see also Stepdesign, Inc. v. Research Media,* 442 F.Supp. 32, 33 (S.D.N.Y. 1977).

**21.** Plaintiffs Memorandum in Opposition 24; *see also id.* at 17–18.

**22.** *Rotardier v. Entertainment Co. Music Group,* 518 F.Supp. 919 (S.D.N.Y.1981).